## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| EVA MORENO, individually, | § | |
| JUAN MORENO, individually and | § | |
| as Personal Representative of the | § | |
| estate of Juan Manuel "Johnny" | § | |
| Moreno, Jr., VALERIA MORENO, | § | |
| as next friend of A.M. and J.M., and | § | |
| JESSICA COMPOZANA, as next | § | |
| friend of J.M., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-cv-1371 |
| | § | |
| MICHAEL DUNN, and | § | |
| FARMERS BRANCH, TEXAS, | § | |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Plaintiffs EVA MORENO, individually, JUAN MORENO, individually, and as Personal Representative of the estate of Juan Manuel "Johnny" Moreno, Jr., VALERIA MORENO, as next friend of A.M. and J.M., and JESSICA COMPOZANA, as next friend of J.M., by and through their counsel, and hereby state the following in support of their Original Complaint for the wrongful death of their son and father, respectively:

> "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."

*Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).

## SUMMARY



On June 12, 2019, former Farmers Branch Police Officer Michael Dunn shot and killed Juan "Johnny" Moreno as Johnny drove a truck through a parking lot without posing a danger to any other person, including Dunn. Although Dunn claimed that he shot Johnny because he was in fear for his life of being run over by the truck, the security camera footage clearly contradicted this fabricated version of events, as Dunn was never in the path of the truck or in harm's way due to the distance between the truck and Dunn depicted in the above screenshot from the security footage.

Farmers Branch trained Dunn throughout his career to use his firearm in tense and rapidly evolving situations; but failed to train Dunn not to use his firearm in those same situations when the use of deadly force was not necessary or justified. As a result of this training, Dunn used excessive deadly force against Johnny Moreno on June 12, 2019.

Plaintiffs now file this lawsuit against Dunn and the City of Farmers Branch for the wrongful death of their son and father and for violating Johnny's constitutional rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures, by way of excessive deadly force.

## I.

## PARTIES

1.     Plaintiff Eva Moreno is a resident of Dallas County.

2.     Plaintiff Juan Moreno is a resident of Dallas County.

3.     Plaintiff Valeria Moreno is a resident of Dallas County.

4.     Plaintiff Jessica Campozano is a resident of Dallas County.

5.     Defendant Michael Dunn is an individual residing in Dallas County, Texas and at all times relevant to this lawsuit was a police officer with the City of Farmers Branch Police Department, and may be served at his residence in Dallas, Texas or wherever he may be found. Defendant Dunn is being sued in his individual capacity.

6.     Defendant Farmers Branch, Texas is a political subdivision of the State of Texas and may be served through the Farmers Branch City Manager, Charles S. Cox, located at 13000 William Dodson Parkway, Farmers Branch, TX 75234 or wherever he may be found.

## II.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983.

8.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Northern District of Texas, and all or a substantial part of the cause of action accrued in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

9.     On June 12, 2019, Defendant Officer Michael Dunn shot and killed Juan "Johnny" Moreno without legal reason or justification and in violation of his rights under the Fourth Amendment to the United States Constitution.

10.     Security camera footage captured Defendant Dunn fatally shooting Johnny Moreno despite Johnny not presenting a threat to Defendant Dunn or any other officer or person.[1]

### Defendant Dunn Used Unreasonable and Excessive Deadly Force

11.     On June 12, 2019, Johnny Moreno was at the Mug and Mouse Adult Arcade located in a commercial two-story strip mall located at 11441 N. Stemmons Freeway, Dallas, Texas 75229 near the intersection of Royal Lane and Stemmons Freeway.

12.     Johnny agreed to give Raul Gonzales a ride to work from the Mug and Mouse Adult Arcade.

13.     Johnny, Johnny's female companion, and Raul walked out of the Mug and Mouse and across the parking lot to the truck Johnny was driving.

---

[1] The security camera footage is attached as Exhibit A and is incorporated into this Complaint in full.



14.    In the above screenshot from the security camera footage attached as Exhibit A, Johnny is identified with a blue arrow, Raul is identified with a green arrow, and Johnny's female companion is identified with a purple arrow.

15.    Raul entered the rear passenger seat of the pickup truck as Johnny entered the driver seat.

16.    Johnny's female companion walked around the back of the truck to enter the front passenger seat, but never made it inside of the pickup truck.

17.    Once Johnny and Raul entered the truck, Defendant Dunn drove his Farmers Branch Police vehicle through the parking lot toward the truck.



18.     Defendant Dunn did not park his vehicle in front of the pickup truck, but instead parked perpendicular to the driver's side of the pickup, which left a clear path for Johnny to drive the truck.



19.     Johnny drove the pickup truck forward and turned to the left as Defendant Dunn exited his vehicle.



20.     Johnny turned the truck in a way that left a safe distance between the tuck and Defendant Dunn as well as Defendant Dunn's vehicle.

21.     Despite this distance between the truck and Defendant Dunn, Defendant Dunn unholstered his department issued firearm.



22.     An enhanced image of the security camera video shows Defendant Dunn unholstering his firearm despite the fact that the front of the truck was already turning wide enough to keep Defendant Dunn out of danger.



23.     In the above enhanced image of the security camera video attached as Exhibit A, Defendant Dunn is identified with a red arrow and Defendant Dunn's arm, which is being used to unholster his firearm is identified with a yellow arrow.

24.     Johnny maneuvered the truck so that he safely turned around Defendant Dunn without placing Defendant Dunn in harm's way of the truck.



25.     An enhanced image of the security camera video shows Defendant Dunn pointing his firearm at Johnny despite Johnny turning the truck in a way that left a safe distance between Defendant Dunn and the truck.



26.    In the above enhanced image of the security camera video attached as Exhibit A, Defendant Dunn is identified with a red arrow and is clearly not in the path of the truck or in danger of being struck by the truck as it turned.

27.    Despite this safe distance, Defendant Dunn pointed his department issued firearm at Johnny and fired multiple shots, fatally injuring Johnny.



28.     In the above enhanced image of the security camera video attached as Exhibit A, Defendant Dunn, identified with a red arrow, is clearly not in the path of the truck or in danger of being struck by the truck as it turned and can be seen pointing and firing his department issued firearm at Johnny.

29.     Another camera from the second story of the strip mall shows how wide the distance was between the truck and Defendant Dunn when Defendant Dunn fatally shot Johnny.



30.    In the above image from the second story camera, Defendant Dunn, identified with a red arrow, can be seen pointing his firearm and shooting at Johnny despite Defendant Dunn not being in the path of the vehicle and Johnny not posing a threat of harm to Defendant Dunn or any other person.

31.    Defendant Dunn fired multiple shots into the windshield and driver's door window as he aimed his firearm to kill Johnny, just as he had been trained.

32.    Defendant Dunn shot Johnny in the head, killing him.

33.    After Defendant Dunn shot Johnny, Johnny was no longer able to control the truck and it collided with a nearby parked vehicle.



34.    At no time did Johnny verbally threaten Defendant Dunn.

35.    At no time did Johnny attempt to turn the truck toward Defendant Dunn, as the truck turned wide to the left leaving a safe distance between Defendant Dunn and the truck at all times.

36.    This safe distance can be clearly seen on the security footage.

37.    At no time in Defendant Dunn's presence did Johnny threaten any other person or drive the truck in a manner that could have injured any other person as there were no people in the path of the truck.

38.    Defendant Dunn was at all times acting under the color of law as he was wearing his department issued uniform, arrived in his department issued vehicle with his overhead emergency lights activated, was acting in concert with other Farmers Branch

officers in attempting to detain Johnny, and used his department issued firearm to shoot and kill Johnny during the attempted detainment.

39.     Following the shooting, the case was sent to a Dallas County Grand Jury, and Defendant Dunn was indicted for Murder.

40.     As of the filing of this Original Complaint, Defendant Dunn's criminal case, F-1900402 in Dallas County, for the murder of Juan "Johnny" Moreno, is still ongoing and awaiting trial.

### The City of Farmers Branch Failed to Adequately Train Defendant Dunn with the Probable Outcome Being the Use of Excessive Deadly Force

41.     Defendant Dunn has only been employed as a law enforcement officer in the state of Texas by one agency – Farmers Branch Police Department.

42.     Accordingly, all of Defendant Dunn's training related to law enforcement in the state of Texas has been completed while employed by the city of Farmers Branch and at the direction and under the supervision of the city of Farmers Branch.

43.     Farmers Branch trained Defendant Dunn throughout his entire career to use his firearm in tense and rapidly evolving situations; but failed to train Defendant Dunn not to use his firearm in those same situations when the use of deadly force was not necessary or justified.

44.     As a result of this training, Defendant Dunn used excessive deadly force against Johnny on June 12, 2019.

45.     Throughout Defendant Dunn's thirteen-year career with Farmers Branch, which includes the time period following Defendant Dunn's use of deadly force against Johnny where Farmers Branch has yet to terminate Defendant Dunn, the Texas

Commission on Law Enforcement indicates he has 3500 hours of training, with 420 being training hours from education, and 3080 total course hours.

46.     However, from 09/01/2005 to 08/31/2019, the report indicates that prior to Defendant Dunn being placed on enforcement hold on 07/03/19 following his use of deadly force against Johnny, of all of the hours and courses of training, over an eleven-and-a-half-year career, **a mere four hours of training was in De-escalation of Force**, which Defendant Dunn received on 02/01/18, and only two hours of basic First Aid training received on January 23, 2013.

47.     This means that in Defendant Dunn's career, Farmers Branch only required that **0.001 percent of his training be completed on De-escalation of Force**.

48.     Instead of requiring Defendant Dunn to complete De-escalation of Force training, Farmers Branch allowed Defendant Dunn to completed hundreds of hours of discharging firearms training, with a large majority of that being S.W.A.T., S.W.A.T. Sniper training, Tactical Firearms Training, Firearms, Hostage and Barricade Suspect Situations, Rifle and other firearms and discharging firearms training.

49.     Additionally, of Defendant Dunn's 3080 total course hours, Farmers Branch only required Defendant Dunn to complete training related to racial profiling during a combined asset forfeiture and racial profiling class back on 11/14/2006 which lasted a total of six hours for both topics and an online cultural diversity class back on 8/23/2012 that lasted only eight hours.

50.     Assuming the combined asset forfeiture and racial profiling class in 2006 split the time between the two topics, Defendant Dunn was only required to complete less than 14 hours out of 3080 hours of course time on race issues and cultural diversity.

51.   Interestingly, following Defendant Dunn's use of deadly force against Johnny, Defendant Dunn completed two more courses on Racial and Bias Profiling.

52.   Defendant Dunn only completed one Use of Force course back on 2/17/2011 that lasted sixteen hours.

53.   It was not until after using deadly force against Johnny that Defendant Dunn took his second Use of Force course – and first Use of Deadly Force course on 4/18/2020, which lasted one hour.

54.   In the ten years prior to Defendant Dunn's use of excessive deadly force against Johnny, Farmers Branch oversaw Defendant Dunn complete one thousand ninety-four training hours, of which five hundred and seventy-four hours were devoted to S.W.A.T training, Hostage and Barricade Suspect Situations, Tactical Firearms Training, Firearms Training, Mass Casualty Training, and Rifle training – accounting for over half of his training in that ten-year period.

55.   However, during that same ten-year period prior to Defendant Dunn's use of excessive deadly force against Johnny, Defendant Dunn only completed four hours of De-escalation of Force training – accounting for 0.003 percent of his training over that ten-year period.

56.   In 2019, prior to using deadly force against Johnny on June 12, 2019, Defendant Dunn completed a total of seventeen hours of training – all S.W.A.T. training.

57.   Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2019.

58.   In 2018, Defendant Dunn completed fifty-four hours of training – forty-three hours of which was devoted to S.W.A.T training, Hostage and Barricade Suspect Situations, Tactical Firearms Training, and Mass Casualty Training.

59.     Defendant Dunn completed zero hours of Use of Force training or racial issue training in 2018 and only completed one four-hour course on De-Escalation of Force, which was the only De-Escalation of Force course Farmers Branch required Defendant Dunn to complete out of his 3080 hours of course training in his career.

60.     In 2017, Defendant Dunn completed a total of 10 hours of training – all in one course titled Hostage and Barricade Suspect Situations.

61.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2017.

62.     In 2016, Defendant Dunn completed one hundred and forty-nine hours of training – ninety-eight hours of which was devoted to S.W.A.T. training, S.W.A.T. Sniper training, Tactical Firearm training, and Hostage and Barricade Suspect Situations.

63.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2016.

64.     In 2015, Defendant Dunn completed one hundred and fifty-four hours of training – one hundred and twenty-eight of which was devoted to S.W.A.T. training, S.W.A.T. Sniper training, Tactical Firearm training, and Hostage and Barricade Suspect Situations.

65.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2015.

66.     In 2014, Defendant Dunn completed one hundred and forty-nine hours of training – sixty-nine of which was devoted to S.W.A.T. training, S.W.A.T. Sniper training, Tactical Firearm training, and Rifle training.

67.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2014.

68.     In 2013, Defendant Dunn completed one hundred and fifty-one hours of training – sixty-four of which was devoted to S.W.A.T. training, S.W.A.T. Sniper training, Firearms training, and Hostage and Barricade Suspect Situations.

69.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, De-escalation of Force training, or racial issue training in 2013.

70.     In 2012, Defendant Dunn completed seventy-six hours of training – forty-eight of which was devoted to S.W.A.T. training, S.W.A.T. Sniper training, and Firearms training.

71.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, or De-escalation of Force training, and completed only eight hours of online cultural diversity exercises in 2012.

72.     In 2011, Defendant Dunn completed eighty hours of training – thirty-seven of which was devoted to S.W.A.T. training.

73.     Defendant Dunn completed zero hours of Deadly Force training or De-escalation of Force training in 2011 but did take his only Use of Force course prior to his use of excessive deadly force against Johnny.

74.     In 2010, Defendant Dunn completed one hundred and nine hours of training.

75.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, or De-escalation of Force training, in 2010.

76.     In 2009, Defendant Dunn completed one hundred and forty-one hours of training– sixty of which was devoted to S.W.A.T. training.

77.     Defendant Dunn completed zero hours of Use of Force training, Deadly Force training, or De-escalation of Force training, in 2009.

78.     Upon information and belief, Farmers Branch required former Farmers Branch Police Officer Ken Johnson to complete similar limited training pertaining to Use of Force, Use of Deadly Force, and De-Escalation of Force as compared to the amount of training Johnson received on using his firearm; therefore, Farmers Branch was on notice that the amount and type of training it required of its officers would lead to the use of excessive deadly force as was the case when Johnson shot and killed one teenager and seriously wounded another in March of 2016, for which he was ultimately convicted of Murder.

### Farmers Branch's Culture of Hostility Toward Minorities

79.     Farmers Branch has a culture dating back to 2006, the year Defendant Dunn began working for Farmers Branch, of showing hostility toward minority communities.

80.     This Anti-Minority culture was deeply entrenched in the policies and practices of Farmers Branch.

81.     In 2006, former Farmers Branch Police Chief Jimmy Fawcett made remarks to the City Counsel about an applicant to his department. The man, who had just graduated from the police academy, was Vietnamese. The Farmers Branch Chief of Police stated in reference to the man, "As long as I'm chief, we won't have any gooks working in the Farmers Branch police department."

82.     In May of 2006, eighteen-month-old Eva Gallegos was shot to death while sleeping in her bedroom in West Farmers Branch. Two acquaintances of Eva's father were later arrested for the shooting and described as being "suspected illegal immigrants." This further ignited the Anti-Minority culture running rampant throughout Farmers Branch.

83.     In late 2006, Farmers Branch passed resolution 2006-130, making English the official "business" language of the city.

84.     Farmers Branch then introduced Ordinance 2892, which directed that "the owner and/or property manager shall require as a prerequisite to entering into any lease or rental arrangement...the submission of evidence of citizenship or eligible immigration status for each tenant family."

85.     In ruling that Ordinance 2952 was unconstitutional, the Fifth Circuit wrote, "We conclude that the ordinance's sole purpose is not to regulate housing but to exclude undocumented aliens, specifically Latinos, from the City of Farmers Branch and that it is an impermissible regulation of immigration."

86.     It was also determined through another lawsuit that the Farmers Branch City Counsel adopted Ordinance 2982 as well as Ordinance 2893, which was directed at property maintenance and was disproportionately applied to Hispanic neighborhoods, behind closed doors in violation of the Texas Open Meetings Act.

87.     This Anti-Minority culture was in place in Farmers Branch when Defendant Dunn was hired in 2006 and remained the culture throughout Defendant Dunn's career with Farmers Branch.

88.     Farmers Branch's Anti-Minority culture is the reason Defendant Dunn only took one class on racial profiling, a combined class with asset forfeiture back in 2006, prior to his use of excessive deadly force against Johnny in 2019.

89.     Farmers Branch's Anti-Minority culture in conjunction with Farmers Branch's dedication to training officers how to use their firearms but not how to de-escalate a situation or when not to use their firearms caused former Farmers Branch

Police Officer Ken Johnson to use excessive deadly force in shooting Jose Cruz and Edgar Rodriguez in 2016.

90.   This Anti-Minority culture deeply embedded in Farmers Branch and the only culture Defendant Dunn has known since his arrival to the Farmers Branch Police Department in 2006 was front and center during a protest following Jonson's use of excessive deadly force in the shooting of Cruz and Rodriquez.

91.   When an officer was needed to stand between a group of Hispanic protestors and the Farmers Branch City Council – Farmers Branch knew exactly who they should use as the officer for the job – Defendant Dunn, an officer that had been around since 2006 and understood what the City Council stood for and felt about the Hispanic protesters in front of them.



92.   The above image depicts Defendant Dunn, identified with a red arrow, standing guard between a group of Hispanic protestors and the Farmers Branch City Council.

93.     Farmers Branch's Anti-Minority culture in conjunction with Farmers Branch's dedication to training officers how to use their firearms but not how to de-escalate a situation or when not to use their firearms caused Defendant Dunn to use excessive deadly force in shooting Johnny on June 12, 2019.

94.     Defendants were at all times acting under color of law.

## IV.
## CAUSES OF ACTION

### Count One

### Use of Excessive Deadly Force
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Michael Dunn

95.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

96.     Acting under the color of law, Defendant Dunn deprived Johnny Moreno of the rights and privileges secured to him by the Fourth Amendment, as applied to the states by the Fourteenth Amendment, to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of deadly force. Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

97.     The amount of force used by Defendant Dunn against Johnny as described above, specifically but not limited to, when Defendant Dunn shot and killed Johnny despite Johnny not posing a threat of serious physical harm to Defendant Dunn, other officers, or other people at the time, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, suffering, and death upon Johnny.

98.     A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

99.     It is clearly established that it is unreasonable for a police officer to use deadly force by way of a gun against a fleeing felon in a vehicle who does not pose a sufficient threat of harm to the officer or others. *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 417 (5th Cir. 2009); *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).

100.     As the Fifth Circuit explained, "[b]ut, 'in an obvious case,' general standards 'can 'clearly establish' the answer, even without a body of relevant case law.' As the Supreme Court has summarized, qualified 'immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). The Fifth Circuit explained further that, "[i]n *Garner*, the Supreme Court held that '[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'" *Id.*

101.     The Fifth Circuit defines deadly force as force that "creates a substantial risk of death or serious bodily injury." *Aguirre v. City of San Antonio*, 995 F.3d 395, 413 (5th Cir. 2021); citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998)

102.     Claims that law enforcement unreasonably utilized deadly force are treated as a special subset of excessive force claims. *Aguirre*, 995 F.3d at 412; citing *Gutierrez*, 139 F.3d at 446; citing *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701.

103.     As the Fifth Circuit has explained, "we have long held that the use of 'deadly force' is unreasonable where the officer does not have 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others,'

23

*Aguirre*, 995 F.3d at 412-13; citing *Gutierrez*, 139 F.3d at 446; quoting *Garner*, 471 U.S. at 11, 105 S.Ct. 1694.

104.   The Fifth Circuit has also stated that guns represent the paradigmatic example of deadly force. *Gutierrez*, 139 F.3d at 446.

105.   Johnny did not pose a threat of serious physical harm to any officer or other person immediately prior to Defendant Dunn shooting him, as Johnny turned the truck so that there was a safe and clear distance between the truck and Defendant Dunn and so that Defendant Dunn was never in the path of the truck or in harm's way; thus, this is an obvious case where Defendant Dunn's use of deadly force in shooting Johnny was unreasonable.

106.   A reasonable officer would know that the use of deadly force is <u>clearly excessive</u> when engaging with suspects such as Johnny, who was not threatening any officer or other person and who the use of deadly force was not warranted.

107.   A reasonable officer would know that the use of deadly force is <u>clearly unreasonable</u> when engaging with suspects such as Johnny, who was not threatening any officer or other person and who the use of deadly force was not warranted.

108.   A reasonable officer in Defendant Dunn's shoes would know that shooting a suspect who is driving a vehicle slowly and is clearly avoiding contact with the officer so that the officer nor any other person are never in the path of the vehicle or in harm's way is clearly unreasonable and excessive.

109.   As a direct result of the deadly force used against him by Defendant Dunn, Johnny suffered physical injury, pain, mental anguish, and death for which Plaintiffs sue herein.

110.   These injuries were not caused by any other means.

## Count Two

### DELIBERATE INDIFFERENCE AND CAUSES OF ACTION UNDER
### *Monell v. New York City Department of Social Services*
### Violations of the 4th Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Farmers Branch, Texas

111.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

112.     Municipalities, including counties and cities, may be held liable under § 1983. *Hampton Co. Nat'l Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 224 (5th Cir. 2008).

113.     A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his or her constitutional rights. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978).

114.     Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

115.     "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

116.     The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly

represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

117.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields*, 860 F.3d at 808.

118.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

119.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

### Policymaker

120.    The Farmers Branch City Council is the "final policymaker" for the City of Farmers Branch.

121.    Additionally, the Farmers Branch Police Chief has been delegated policy-making authority in the area of law enforcement training and policies in the Farmers Branch Police Department by the Farmers Branch City Council.

122.    The Farmers Branch Police Chief is directly involved with implementing each of the City Council's policies and practices discussed in this lawsuit, including the training of Farmers Branch Police Officers; accordingly, he had actual knowledge of each.

123.    Alternatively, the Farmers Branch Police Chief had constructive knowledge of the failure of the training policy at the department, as the Police Chief would have known of these practices in the department had he exercised his responsibilities.

### Policies, Customs, and Practices
### Which were Moving Force of Constitutional Violations

124.    The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

### The City's Custom and Practice
### of Showing Hostility Toward Minority Citizens

125.    Farmers Branch has a culture dating back to 2006, the year Defendant Dunn began working for Farmers Branch, of showing hostility toward minority communities.

126.    This Anti-Minority culture was deeply entrenched in the policies and practices of Farmers Branch.

127.    This Anti-Minority culture was in place in Farmers Branch when Defendant Dunn was hired in 2006 and remained the culture throughout Defendant Dunn's career with Farmers Branch.

128.    Farmers Branch's Anti-Minority culture is the reason Defendant Dunn only took one class on racial profiling, a combined class with asset forfeiture back in 2006, prior to his use of excessive deadly force against Johnny in 2019.

129.    This Anti-Minority culture deeply embedded in Farmers Branch and the only culture Defendant Dunn has known since his arrival to the Farmers Branch Police Department in 2006 was front and center during a protest following Jonson's use of excessive deadly force in the shooting of Cruz and Rodriquez in 2016.

## The City's Failure to Train

130.    "It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability." *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 457 (5th Cir.2000) (subsequent appeal after remand of *Brown v. Bryan Cnty., Okla.*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626) (holding that a sheriff's failure to train a county deputy that resulted in constitutional violation could be county policy).

131.    Indeed, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* (quoting *City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)*); *Oporto v. City of El Paso*, EP-10-CV-110, 2010 WL3503457, at *7 (W.D. Tex. Sept. 2, 2010).

132.    If in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need, then the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. *City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)*.

133.    "For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with

firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n. 10.

134.    The inadequacy of training must be closely related to the injury. *Pineda v. City of Houston*, 291 F.3d 325, 331–32 (5th Cir. 2002).

135.    To plead a plausible failure-to-train claim, a plaintiff must allege sufficient facts to show: "(1) the training procedures were inadequate; (2) the [city's] policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [the plaintiff's] injury." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

### (1)    Training Procedure was Inadequate

136.    Farmers Branch trained Defendant Dunn throughout his entire career to use his firearm in tense and rapidly evolving situations; but failed to train Defendant Dunn not to use his firearm in those same situations when the use of deadly force was not necessary or justified.

137.    As a result of this training, Defendant Dunn used excessive deadly force against Johnny on June 12, 2019.

138.    Throughout Defendant Dunn's thirteen-year career with Farmers Branch, which includes the time period following Defendant Dunn's use of deadly force against Johnny where Farmers Branch has yet to terminate Defendant Dunn, the Texas Commission on Law Enforcement indicates he has 3500 hours of training, with 420 being training hours from education, and 3080 total course hours.

139.    However, from 09/01/2005 to 08/31/2019, the report indicates that prior to Defendant Dunn being placed on enforcement hold on 07/03/19 following his use of deadly force against Johnny, of all of the hours and courses of training, over an eleven-and-a-half-year career, **a mere four hours of training was in De-escalation of Force**, which Defendant Dunn received on 02/01/18, and only two hours of basic First Aid training received on January 23, 2013.

140.    This means that in Defendant Dunn's career, Farmers Branch only required that **0.001 percent of his training be completed on De-escalation of Force**.

141.    Instead of requiring Defendant Dunn to complete De-escalation of Force training, Farmers Branch allowed Defendant Dunn to completed hundreds of hours of discharging firearms training, with a large majority of that being S.W.A.T., S.W.A.T. Sniper training, Tactical Firearms Training, Firearms, Hostage and Barricade Suspect Situations, Rifle and other firearms and discharging firearms training.

142.    Additionally, of Defendant Dunn's 3080 total course hours, Farmers Branch only required Defendant Dunn to complete training related to racial profiling during a combined asset forfeiture and racial profiling class back on 11/14/2006 which lasted a total of six hours for both topics and an online cultural diversity class back on 8/23/2012 that lasted only eight hours.

143.    Assuming the combined asset forfeiture and racial profiling class in 2006 split the time between the two topics, Defendant Dunn was only required to complete less than 14 hours out of 3080 hours of course time on race issues and cultural diversity.

144.    Interestingly, following Defendant Dunn's use of deadly force against Johnny, Defendant Dunn completed two more courses on Racial and Bias Profiling.

145.    Defendant Dunn only completed one Use of Force course back on 2/17/2011 that lasted sixteen hours.

146.    It was not until after using deadly force against Johnny that Defendant Dunn took his second Use of Force course – and first Use of Deadly Force course on 4/18/2020, which lasted one hour.

147.    In the ten years prior to Defendant Dunn's use of excessive deadly force against Johnny, Farmers Branch oversaw Defendant Dunn complete one thousand ninety-four training hours, of which five hundred and seventy-four hours were devoted to S.W.A.T training, Hostage and Barricade Suspect Situations, Tactical Firearms Training, Firearms Training, Mass Casualty Training, and Rifle training – accounting for over half of his training in that ten-year period.

148.    However, during that same ten-year period prior to Defendant Dunn's use of excessive deadly force against Johnny, Defendant Dunn only completed four hours of De-escalation of Force training – accounting for 0.003 percent of his training over that ten-year period.

### (2)    City's Policymaker was Deliberately Indifferent in Adopting the Training Policy

149.    Farmers Branch policymakers knew to a moral certainty that their police officers would be required to arrest fleeing felons. The city armed its officers, including Defendant Dunn, with firearms, in part to allow them to accomplish this task. Thus, the need to train officers, including Defendant Dunn, in the constitutional limitations on the use of deadly force is 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n. 10.

150.    Additionally, upon information and belief, Farmers Branch required former Farmers Branch Police Officer Ken Johnson to complete similar limited training pertaining to Use of Force, Use of Deadly Force, and De-Escalation of Force as compared to the amount of training Johnson received on using his firearm; therefore, Farmers Branch was on notice that the amount and type of training it required of its officers would lead to the use of excessive deadly force as was the case when Johnson shot and killed one teenager and seriously wounded another in March of 2016, for which he was ultimately convicted of Murder.

### (3)    Inadequate Training Policy Directly Caused Johnny's Injury

151.    As a result of this inadequate training due to the City's deliberately indifferent training policy, Defendant Dunn used excessive deadly force against Johnny on June 12, 2019.

## Policies and Practices Work Together

152.    The § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg*, 907 F.3d at 255; See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id.* The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id.*

153.    Farmers Branch's Anti-Minority culture, which lead to a lack of race relations training, in conjunction with Farmers Branch's dedication to training officers how to use their firearms but not how to de-escalate a situation or when not to use their firearms interacted with one another and exacerbated the harmful effects of one another,

causing Defendant Dunn to use excessive deadly force in shooting Johnny on June 12, 2019.

**Count Three**

**<u>Wrongful Death</u>**
**Against Defendants Michael Dunn and Farmers Branch, Texas**

154.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

155.   Plaintiff Eva Moreno is Johnny Moreno's mother.

156.   Plaintiff Juan Moreno is Johnny Moreno's father.

157.   Valeria Moreno brings this lawsuit on behalf of A.M and J.M. who are Johnny Moreno's children.

158.   Jessica Campozano brings this lawsuit on behalf of J.M. who is Johnny Moreno's child.

159.   By reason of Defendant Dunn's wrongful conduct of fatally shooting Johnny as Johnny drove his truck without posing a reasonable, credible, or imminent threat to any person, Defendant Dunn is liable for damages.

160.   By reason of Defendant Farmers Branch's deliberately indifferent policies, practices, and customs, which caused Defendant Dunn to fatally shoot Johnny as Johnny drove his truck without posing a reasonable, credible, or imminent threat to any person, Defendant Farmers Branch is liable for damages.

161.   To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

162.    Defendant Dunn's excessive use of deadly force against Johnny Moreno, as described herein, violated Johnny's constitutional right under the Fourth Amendment and caused his death.

163.    Defendant Dunn's conduct that caused Johnny Moreno's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Dunn is liable for his acts and infliction of emotional distress caused by the wrongful death of Johnny Moreno.

164.    Defendant Farmer's Branch's deliberate indifference, as described herein, caused the excessive use of deadly force against Johnny Moreno, which violated Johnny's constitutional right under the Fourth Amendment and caused his death.

165.    Defendant Farmers Branch's conduct that caused Johnny Moreno's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Farmers Branch is liable for its acts and infliction of emotional distress caused by the wrongful death of Johnny Moreno.

166.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### Count Four

### <u>Survival Action</u>
**Against Defendants Michael Dunn and Farmers Branch, Texas**

167.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

168.    Plaintiff Juan Moreno brings this claim as Personal Representative of the estate of Juan "Johnny" Moreno.

169.    Johnny Moreno died because of the Defendants' wrongful conduct.

170.    Johnny Moreno would have been entitled to bring this action against the Defendants if he had lived.

171.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

172.    The Defendants are liable to the Estate of the deceased for the loss of Johnny Moreno's life, pain and suffering, and the violation of his civil rights.

173.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## V.
## PUNITIVE DAMAGES

174.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

175.    When viewed objectively from the standpoint of Defendant Dunn, at the time of the occurrence, his conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

176.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Dunn, Plaintiffs are entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

177.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

178.    Plaintiffs' injuries were a foreseeable event. Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Plaintiff and their unconstitutional policies applied against Plaintiff.

179.    As a result, Plaintiff is entitled to recover all actual damages allowed by law. Plaintiff contends the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Plaintiff's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against the Individual Defendants.

180.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs were forced to suffer:

      a.     Actual damages;

      b.     Loss of affection, consortium, comfort, financial assistance, protection, and care;

      c.     Pain and suffering and mental anguish suffered by Johnny Moreno prior to his death;

      d.     Mental anguish and emotional distress suffered by Plaintiffs;

      e.     Loss of quality of life;

      f     Funeral and burial expenses;

      g.     Loss of service;

      h.     Loss of earnings and contributions to Plaintiffs;

      i.     Prejudgment interest; and

      j.     Post judgment interest.

181.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

182.     If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

183.     Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

CHARLA G. ALDOUS
State Bar. No. 20545235
BRENT R. WALKER
State Bar No. 24047053
CALEB MILLER
State Bar No. 24098104

ALDOUS\WALKER LLP
4311 Oak Lawn Ave., Suite 150
Dallas, TX 75219
Phone: (214) 526-5595
Fax:    (214) 526-5525
caldous@aldouslaw.com
bwalker@aldouslaw.com
cmiller@aldouslaw.com

JEFFREY RASANSKY
State Bar Number 16551150

RASANSKY LAW FIRM
2525 McKinnon Street
Suite 550
Dallas, TX 75201
Phone: (214) 651-6100
Fax: (214) 651-6150
jrasansky@aldouslaw.com

COUNSEL FOR PLAINTIFFS